## In re CENTRAL VERMONT MEDICAL CENTER

[816 A.2d 531]

No. 01-461

¶ 1. December 16, 2002. Central Vermont Medical Center (CVMC) appeals the denial of its application for a Certificate of Need (CON) by the Commissioner of the Department of Banking, Insurance, Securities, and Health Care Administration (BISHCA). CVMC applied for a CON in order to proceed with a renovation and expansion project for the Central Vermont Hospital ("the Hospital"). CVMC argues that the Commissioner erred (1) by not providing the required explanation for her decision; (2) by implementing a new standard without notice as required by Vermont law; (3) by violating CVMC's due process rights in not providing CVMC an opportunity to present information necessary to receive CON approval; and (4) by incorrectly concluding that a CON was not warranted given evidence to the contrary. We affirm.

¶ 2. In December 2000, CVMC filed a CON application related to its proposed project with BISHCA's Division of Health Care Administration ("the Division"). See 18 V.S.A. § 9434(a) ("No new institutional health service shall be . . . developed within this state . . . without a determination of need and issuance of a certificate of need by the commissioner . . . ."). CVMC's proposal called for an approximately $12.5 million modernization project, which included upgrading hospital infrastructure, providing additional space for ambulatory patient care (i.e., outpatient care), and improving the birthing center with integrated labor, delivery, recovery and post-partum care rooms. The project also included relocating the Hospital's laboratory and administrative functions to provide space for revisions to the ambulatory patient processing area.

¶ 3. In May, after several supplemental filings, the Division ruled the application complete and scheduled a public hearing with the Public Oversight Commission (POC), which took place in June. In July, the POC recommended approval of the application.

¶ 4. Following this recommendation, in accordance with the CON statute and regulations, the Commissioner reviewed the application, considering numerous general and mandatory criteria. See 18 V.S.A. § 9440(c)(4). In September, the Commissioner denied CVMC's CON application. The Commissioner analyzed three of the "general criteria" listed in 18 V.S.A. § 9436(a): the need for the proposed project on the part of the population served, § 9436(a)(4); the availability of less costly or more effective alternatives, § 9436(a)(5); and the project's probable impact on the costs of and charges for providing health services, § 9436(a)(6). The Commissioner also found that four of the five "mandatory criteria" under 18 V.S.A. § 9437 were relevant to CVMC's CON application. In order for a CON to issue, the Commissioner was required to find that superior alternatives to the project in terms of cost, efficiency and appropriateness did not exist, § 9437(1); that alternatives to new construction involved in the project, such as modernization or sharing arrangements, had been considered and implemented to the maximum extent possible, § 9437(2); that patients would experience serious problems in terms of costs, availability, or accessibility without the proposed project, § 9437(3); and the proposed project is consistent with the CON and within the portion of the unified health care budget applicable to the Hospital, § 9437(5).

¶ 5. The Commissioner found that CVMC's application did not demonstrate the requisite need for the project, did not

adequately explore less costly alternatives and understated the costliness of the project, and therefore, the application failed to meet the general and mandatory criteria set out by statute. Specifically, the Commissioner found that while the infrastructure improvements were the primary goal of the overall project, CVMC had failed to provide adequate information about these improvements. The Commissioner found that the proposed infrastructure improvements related only to the areas affected by the other project goals, such as the enhancements to ambulatory care and the improvements to the birthing center, and not to the vast portion of the hospital facility left untouched by the project, stating: "[t]hat the infrastructure appears to be worn out only in areas that CVMC wants to reconfigure is, perhaps, a coincidence." The Commissioner also found that CVMC did not adequately assess how costly infrastructure improvements would be without the other goals of the project. The Commissioner cited several recommendations by CVMC's engineering consultants that contradicted the need expressed in the application for some of the infrastructure improvements included in the proposal. Finally, the Commissioner found that CVMC failed to account for the loss in investment income that would be incurred from spending its reserve fund on the project. Following the Commissioner's decision, CVMC filed this appeal.

¶ 6. Our standard of review on appeals from orders by the Commissioner is based on 8 V.S.A. § 16, which provides that we may disturb an order by the Commissioner if it: "(1) was issued pursuant to unconstitutional statutory provisions; (2) was in excess of statutory authority; (3) was issued on unlawful procedure; or (4) is not supported by substantial evidence in the record." In general, we have granted administrative bodies a great deal of deference, both in regard to their findings of fact and to their interpretations of their governing statutes and regulations. "[W]e will not set aside an administrative agency's findings unless clearly erroneous. We view the evidence in the light most favorable to the prevailing party and exclude any modifying evidence. So long as the findings are supported by credible evidence, we will not disturb them." *Bigelow v. Dep't of Taxes*, 163 Vt. 33, 35, 652 A.2d 985, 986-87 (1994) (citations omitted); see also *In re AssureCare of Vt., Inc.*, 165 Vt. 535, 538, 686 A.2d 959, 961 (1996) (holding that our standard of review for decisions of the Health Care Authority Board — predecessor to the Division — is "very narrow" and that "we will not disturb the Board's statutory interpretations absent a compelling indication of error." (internal quotation marks and citations omitted)). Decisions of the Commissioner are therefore presumed to be correct, valid and reasonable, absent a clear and convincing showing to the contrary. *In re Prof'l Nurses Serv., Inc.*, 164 Vt. 529, 532, 671 A.2d 1289, 1291 (1996).

¶ 7. CVMC first argues that by not providing a detailed statement explaining why the CON application denial was contrary to the recommendation of the POC, the Commissioner violated both Vermont law and CON regulations. See 18 V.S.A. § 9436(a)(1); BISHCA Reg. H-99-3 § 5(M). The statutory procedures for CON applications call for the Commissioner to consider the POC's recommendation among numerous other general criteria. See 18 V.S.A. §§ 9436(a)(1), 9440(c)(4). The Commissioner has met this minimal statutory obligation, as the decision denying CVMC's CON application refers to the POC recommendation and examines the public hearing proceedings before the POC. The CON regulations, however, require that the decision, if inconsistent with the POC's recommendation, "provide a detailed statement explaining why" the decision differs from the recommendation. BISHCA Reg. H-99-3 § 5(M).

¶ 8. We presume an agency's interpretation of its regulations is correct, and the challenging party must show a compelling indication of error to overcome this presumption. *In re Prof'l Nurses Serv., Inc.*, 168 Vt. 611, 613, 719 A.2d 894, 896 (1998) (mem.). Here, the Commissioner's twenty-two page decision provides substantial justification for her decision, and the Commissioner's response to the POC's recommendation is detailed in the very nature of her decision — specifically noting why CVMC has not established the requisite need for undergoing the project.

¶ 9. CVMC next argues that the Commissioner's decision rests on a new, heightened standard that was improperly created by the Commissioner. CVMC argues that while the CON statute and regulations call for the Commissioner to consider the "need" for the proposed project, the Commissioner's decision stated that CVMC failed to demonstrate that the project was "absolutely necessary," thereby raising the bar without notice to CVMC and violating 18 V.S.A. § 9436(a), which requires that the Commissioner consider "only the criteria which have been duly adopted and published 90 days prior to the submission of the original application for certificate of need."* CVMC relies on previous CON

---

* CVMC's reply brief asserts for the first time that the Commissioner's denial of its CON application was not based solely upon criteria set forth in 18 V.S.A. § 9436(a) but rather upon "unstated political grounds." In support of its assertion, CVMC relies upon a transcript of a January 2002 radio talk show on which Governor Dean responded to an interviewer's questions about the Commissioner's denial of CVMC's CON application. The transcript is not part of the record in this case nor do we agree with the dissent's contention that statements made on a radio talk show may be judi-cially noticed as facts "not subject to reasonable dispute." A judicially noticed adjudicative fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, see, e.g., *Ruppert v. Comm'r of Taxes*, 117 Vt. 83, 86, 85 A.2d 584, 586 (1952) (place of publication of certain newspapers), or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. See, e.g., *Towne v. Rizzico*, 113 Vt. 205, 207, 32 A.2d 129, 130 (1943) (time of sunset); V.R.E. 201. Nor does the attachment of the transcript to the reply brief alter these tests. See, e.g., *Thompson v. Tel. & Data Sys., Inc.*, 888 P.2d 16, 18 (Or. Ct. App. 1994) ("[T]here is a distinction between judicially noticing the existence of a court record and noticing the truth of the contents of that record, much less the truth of the contents of a document that happens to be appended to the court record."). While it may be undisputed that Governor Dean made the statements contained in the transcript, the significance of those statements for this proceeding is uncertain.

Our inability to consider the reply brief does not leave CVMC without a remedy, if it can show that the Commissioner did not comply with the statute, 18 V.S.A. § 9436(a), in rendering her decision. It may petition the superior court for extraordinary relief in the nature of certiorari, pursuant to V.R.A.P. 21. See *In re Mallary*, 127 Vt. 412, 414, 250 A.2d 837, 838 (1969) (writ of certiorari is appropriate to review "the judicial action of inferior courts, special tribunals, public officers, and bodies exercising judicial functions"; writ granted to review action of board of tax appraisers); see also *Franklin v. Hous. Auth. of Milwaukee*, 455 N.W.2d 668, 671 (Wis. Ct. App. 1990) ("[C]ertiorari is available to review legal questions involved in an administrative

application decisions where "need" did not require *absolute need* to justify issuance of a CON.

¶ 10. The statutory provision at issue regarding "need" calls for the Commissioner to consider the "need for the proposed new institutional health service on the part of the population served." 18 V.S.A. § 9436(a)(4). The CON regulations expand on this provision:

> The applicant must demonstrate that the proposed service is needed to maintain the availability and accessibility of health services, or meets specific unmet needs of the area to be served, or that the proposed service will improve the health of the population to be served, or that the service represents a less costly alternative to existing similar services.

_____

agency's decision where statutory appeal is either inadequate to address the issue or is not available."); *Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn. 1992) ("[I]n the absence of an adequate method of review or legal remedy, judicial review of the quasi-judicial decisions of administrative bodies, if available, must be invoked by writ of certiorari."). As part of its petition, CVMC will need to demonstrate that it has no other adequate remedy at law and that no other means of review is available. *In re Mallary*, 127 Vt. at 414-15, 250 A.2d at 838. Further, since "certiorari review is ordinarily restricted to the record," *Hunt v. Village of Bristol*, 159 Vt. 439, 442, 620 A.2d 1266, 1268 (1992), CVMC will need to demonstrate the necessity of supplementing the trial record with "an appropriate evidentiary foundation," *State v. Forte*, 154 Vt. 46, 50, 572 A.2d 941, 943 (1990), concerning the alleged "unstated political grounds" of the Commissioner's decision.

BISHCA Reg. H-99-3 § 6(A)(4).

¶ 11. CVMC's argument that the Commissioner has improperly applied an "absolute need" standard relies on a single sentence of a twenty-two page decision. Much of the Commissioner's decision offers extensive reasoning as to why CVMC's CON application does not demonstrate that the proposed service is needed within the meaning of Reg. H-99-3 § 6(A)(4). For instance, immediately following the "absolutely necessary" language, the decision lists nine examples that demonstrate the Hospital's infrastructure is operating well. Taken in its entirety, the Commissioner's decision highlights significant evidence that many of the project's infrastructure enhancements are not needed, despite the age of the facility. It is within the Commissioner's discretion to determine how she should interpret "need," absent any express direction by the Legislature or any compelling indication of error. Cf. *In re AssureCare of Vt., Inc.*, 165 Vt. at 539, 686 A.2d at 962 (holding that agency did not create new criterion but, within its statutory authority, merely explained existing criterion where agency rejected CON based on applicant's lack of demonstrated ability to operate statewide HMO).

¶ 12. CVMC's use of prior CON application decisions to demonstrate that the Commissioner created a new standard is also not persuasive. Indeed, the CON statute suggests that a degree of flexibility should be allowed from one CON application to another: "[c]riteria applied to a particular review may vary according to the purpose for which that particular review is being conducted or the type of health facility or service which is being reviewed." 18 V.S.A. § 9436(b). So long as the Commissioner's interpretation is not arbitrary or capricious, we will allow it to stand. See *Lilly v. Vt. Headmasters Ass'n*, 160 Vt. 603, 605, 648 A.2d 810, 812 (1993) (mem.) (holding that even where rule in question admits of two interpreta-

tions, agency is entitled to interpret its rule as it sees fit).

¶ 13. Moreover, the previous CON application decisions cited by CVMC can be sufficiently distinguished from the instant case. For instance, the CON application decision in the Fletcher Allen Health Care Ambulatory Care Facility and Redevelopment Project, BISHCA Docket No. 00-033-H (March 2, 2001), states that part of the facility proposed for renovation — the birthing center — was constructed fifty years ago and that "there are a number of life safety, electrical, and heating-ventilation deficiencies." In contrast, the CVMC CON application decision cites numerous instances where CVMC failed to provide necessary information on the need for the proposed project and states that "CVMC has not provided any specific information indicating life safety violations." The CON application decision in the North Country Hospital Expansion/Renovation Project, BISHCA Docket No. 99-038-H (July 10, 2001), cited the hospital's likely loss of accreditation should parts of the project not go forward.

¶ 14. CVMC next argues that because the Commissioner did not offer CVMC the opportunity to supplement the record with information needed to receive a CON, the Commissioner's decision-making process was procedurally unfair and violated CVMC's due process rights. Reasonable notice is required in administrative actions, pursuant to the Administrative Procedure Act. See 3 V.S.A. § 809. "Notice is adequate in an administrative proceeding if the parties are sufficiently apprised of the nature of the proceeding so that there is no unfair surprise." *In re Whitney*, 168 Vt. 209, 213, 719 A.2d 875, 878 (1998). Our standard of review for claims regarding improper notice is well-settled:

> The question on review is not the adequacy of the original notice or pleading but is the fair-

ness of the whole procedure. Critical to a determination of whether the procedure was fair is whether or not the parties were given an adequate opportunity to prepare and respond to the issues raised in the proceeding.

*In re Green Mountain Power Corp.*, 131 Vt. 284, 293, 305 A.2d 571, 577 (1973).

¶ 15. Here, CVMC claims it did not have an opportunity to respond to the Commissioner's heightened standard of absolute need for the proposed project. As we have explained above, however, there is sufficient evidence in the Commissioner's decision that there was no such heightened standard. There is no question that CVMC was provided adequate notice that it would have to show a need for the proposed project, both through the CON statute and the regulations. See 18 V.S.A. § 9434(a) ("[n]o new institutional health service shall be offered or developed . . . without a determination of *need*") (emphasis added); *id.* § 9436(a)(4) (general criteria include the *"need* for the proposed new institutional health service") (emphasis added); BISHCA Reg. H-99-3 § 6(A)(4) (same). With this substantial notice, the burden of proof was on CVMC to show that the proposal met the "need" requirements for CON application approval, not on the Commissioner to ensure that CVMC had demonstrated need for the proposed project such that she would approve of the CON application. See *In re Assure-Care of Vt., Inc.*, 165 Vt. at 541, 686 A.2d at 963 (burden of proof is on applicant to provide evidence on permissive criteria).

¶ 16. Moreover, despite the fact that it had no burden to do so, the Division attempted to solicit additional information on the need for the proposed project throughout the CON application process. Even though CVMC submitted additional information on seven occasions, CVMC still failed to respond adequately

to these requests, as the Commissioner pointed out in her decision: "CVMC offers little or nothing to support its assertions and there is no evidence that the infrastructure is, indeed, 'worn-out.'"

¶ 17. CVMC suggests that because the Division ruled the application complete, the requisite showing of need should have been present in the application. But pursuant to the CON statute and the Department's regulations, a CON application is complete when it "contains all necessary information required." 18 V.S.A. § 9440(b)(4); see also BISHCA Reg. H-99-3 § 4(A) ("[t]he Division shall determine whether the information and data furnished by the applicant meets the requirements of the standard application" to rule upon completeness), A party may, and frequently does, meet the standard for completeness of the CON application ("all necessary information") without being able to establish the need for the proposed project on the part of the population served, § 9436(a)(4), or whether patients would experience serious problems in terms of costs, availability, or accessibility without the proposed project, § 9437(3). In CVMC's case, however, the Commissioner found that the evidence presented was conclusory and inadequate in establishing whether the population served had a need for the proposed project, § 9436(a)(4), or whether patients would experience serious problems in terms of costs, availability, or accessibility without the proposed project, § 9437(3).

¶ 18. CVMC also argues that the Commissioner's decision should be overturned on the grounds that it is clearly erroneous. We disagree. We presume the Commissioner's decisions are correct, valid and reasonable, absent a clear and convincing showing to the contrary. See *In re Prof'l Nurses Serv., Inc.*, 164 Vt. at 532, 671 A.2d at 1291. With regard to factual findings, so long as the Commissioner's findings are supported by credible evidence, viewed in the light most favorable to the prevailing party, we will not disturb them. See *Bigelow*, 163 Vt. at 35, 652 A.2d at 986-87.

¶ 19. CVMC argues that the Commissioner erred in various portions of the decision by failing to consider overwhelming evidence of need for the proposed project. CVMC cites several portions of the record to show that substantial evidence of need existed to justify infrastructure improvements. These citations, however, only support general assertions that infrastructure tends to wear out after thirty years or so. As the Commissioner's decision noted, CVMC failed to provide any substantial evidence in the record that states specific problems in the instant infrastructure. The Commissioner also stated that many of the specific goals in the infrastructure improvements were contradicted by consultants who analyzed the Hospital and its proposal. CVMC also contends that with respect to the ambulatory care and birthing center enhancements the Commissioner disregarded substantial evidence that demonstrated need. CVMC fails to cite any portion of the record that clearly and convincingly demonstrates that the Commissioner's decision was erroneous.

¶ 20. Lastly, CVMC argues that the Commissioner's analysis of the project's long-term financial feasibility, which the Commissioner provided pursuant to 18 V.S.A. § 9436(a)(6), was clearly erroneous. CVMC submits that the Commissioner failed to substantiate her ruling that the projected staff savings are "uncertain." The Commissioner's regulations regarding the financial feasibility criterion provide that an applicant must "demonstrate financial feasibility of the proposal and capacity, including resources sufficient to implement the project and sustain its operation over time." BISHCA Reg. H-99-3 § 6(A)(6). We presume the Commissioner's interpretation of her own regulations is correct, absent a compelling indication of error. See *In*

*re Prof'l Nurses Serv., Inc.*, 168 Vt. at 613, 719 A.2d at 896. The minutes from the POC meeting reflect that when asked how the savings would be realized, CVMC responded merely that "once the work has been completed they could show the savings in the cost of the 'old staffing' versus the 'new efficiencies.'" We find no compelling indication of error in the Commissioner's decision that CVMC had not adequately demonstrated the financial feasibility of the proposed project.

¶ 21. CVMC also notes that the Commissioner's financial feasibility analysis accounts for future interest that would be lost from CVMC's reserve fund because CVMC would expend the fund on the project. CVMC argues that because these interest gains would have to be kept within the fund, they are not actually lost from CVMC's operating budget. Nevertheless, the Commissioner was within her discretion in accounting for depletions from the reserve fund, as these depletions could have an impact on the Hospital's ability to fund what, in the Commissioner's opinion, may be more reasonable capital improvements. This decision was within the Commissioner's statutory role, as defined by 18 V.S.A. § 9431: "the general welfare and protection of the lives, health and property of the people of this state require that all new institutional health services be offered or developed in a manner which . . . promotes *rational allocation of health care resources* in the state." (emphasis added).

¶ 22. We do not quarrel with the dissent's characterization of the significance of CVMC to the community of central Vermont. The issue before us is not how we would have decided the merits of CVMC's CON application but whether — given the standard of review we are bound to apply to appeals of the Commissioner's decisions — we can conclude that the Commissioner erred as a matter of law. On the record before us we cannot.

The Commissioner adequately provided justification for her decision, interpreted her governing statute and regulations in a reasonable manner, and based her findings on credible evidence in the record.

*Affirmed.*

¶ 23. **Skoglund, J.,** dissenting. If this were a case where evidence offered in support of a certificate of need (CON) application had been evaluated below in light of statutes and regulations and a decision based on established criteria, I would approach such a decision with deference. The ruling in this case by the Commissioner of the Department of Banking, Insurance, Securities, and Health Care Administration is not such a decision. Deference must yield when — as here — it is apparent that the decision is contrary to law and considerations of fundamental fairness and appears to have been influenced by an improper criterion. Accordingly, I must respectfully dissent.

I.

¶ 24. This is not a case about individual rights, but it is nevertheless one that speaks to the heart, because it concerns an institution essential to the lives of so many Vermonters. Central Vermont Medical Center is the sole community hospital serving the residents of Montpelier, Barre, Berlin and many other towns. Residents rely on CVMC for a broad range of health care services, including inpatient hospitalization, same-day surgical procedures, birthing services, emergency-room care, and health-and-hospice services. The current hospital facility was built in 1967, and since then has undergone only *two significant improvement* projects, a 1979 renovation of in-patient care areas, and a more recent construction of an attached medical office building.

¶ 25. The current project proposal was driven by changes in health care that

have occurred in the thirty-five years since CVMC's initial construction. As explained in the CON application, "[s]ince the original facility was constructed, CVMC has experienced a major change in the manner in which health care services are provided, with a significant shift to outpatient care. This shift has necessitated a major portion of the current project." Finding that current space was inadequate for same-day patient registration, processing, surgery, and recovery, CVMC proposed to create an expanded and "integrated Ambulatory Care Center," essentially a day hospital, so that registration, processing, surgical procedures, waiting, and recovery would all occur in one area, with attendant projected savings in staffing efficiencies.

¶ 26. Another major change in health care over the last four decades has occurred in the area of birthing services. As explained in the hospital's CON application, the current facility was designed "around care delivery concepts of the 1960's, with Labor/Delivery, Nursery, and Post-partum Recovery located in separate areas." The hospital proposed to modernize the birthing center to address current birthing practices and patient needs by locating labor, delivery, and recovery all in one area, providing the necessary space for mother and family, and simultaneously realizing staffing efficiencies by eliminating the need for nurses in separate areas.

¶ 27. A third component of the project proposal was to upgrade the hospital's largely original thirty-five year old heating, ventilating, air conditioning, and plumbing systems, and to increase the size of the operating rooms, which had become increasingly cramped because changes in technology over several decades had resulted in more equipment in the surgical area.

¶ 28. In addition to a detailed project description and statement of reasons for each of the three project components, the CON application also addressed each of the relevant review criteria set forth in 18 V.S.A. §§ 9436 and 9437, contained tables breaking-down the project costs, and identified sources of funding, the bulk of which ($8.5 million out of total cost of $12.5 million) would come from a special capital reserve fund. The proposal also contained numerous letters of support from local agencies, including home health and hospice, school districts, towns, and businesses attesting to the community's need for the project.

¶ 29. Following the submission of its application, CVMC responded to a series of inquiries from Department staff requesting additional information. The Department's review architect, Susan Davis, conducted a site visit and prepared a report for the Department, and the Public Oversight Commission (POC) conducted two separate public hearings. Davis's report analyzed each component of the proposed project. As to the infrastructure element, the report stated that although CVMC had not adduced "any substantive evidence of breakdowns" or "imminent system failures," its proposal for core infrastructure replacement reflected the normal aging process for facilities built in the 1960's and 1970's, noted that the improvements were intended to bring the facility more in line with today's standards, and observed that an actual failure of the systems could impose significant hardship, compromise operations, and increase the costs of replacement. The report further concluded that it was reasonable to increase the size of operating rooms to accommodate new equipment, allow staff to move more freely, and meet current industry standards, as required for both patient and worker safety. As to the reorganization of ambulatory-care services, the report found that the plan would enhance patient privacy, ease patient access, and relieve overcrowding. With respect to maternity services, the report further found that the current hospital structure did "not meet the expectations of current

medical or social practices," and concluded that the proposed renovation not only remedied this problem, but offered the potential for operational savings through staffing efficiencies. Again, these were the conclusions of the Department's own architectural consultant.

¶ 30. Testimony by hospital officials at the POC hearings underscored the project theme of modernization, noting the fundamental shift in health care to outpatient services and the need to reorient hospital resources accordingly, the need to replace infrastructure that was nearing the end of its projected life cycle, the inadequacy of operating rooms below current standards, and the value of integrating birthing services to respond to contemporary patient needs and expectations. At the conclusion of the second hearing, the POC voted to approve the project, with the understanding that CVMC would provide additional information at a later time on the project's expected cost savings.

¶ 31. Two months later, the Commissioner issued her decision denying the CON. The Commissioner found that CVMC had failed to show a need for the proposed infrastructure improvements, noting in particular that it had failed — in response to staff inquiries — to demonstrate any "life safety violations" or "specific instances of electrical, ventilation, [or] air conditioning malfunctions." The Commissioner underscored this conclusion in a separate subsection of her decision entitled "The Lack of Evidence That the Infrastructure Is Worn-Out," where she reiterated CVMC's failure to provide specific instances of "life safety violations or accreditation issues that would dictate that renovations or replacements are absolutely necessary," and cited Davis's observation that the hospital had not adduced "evidence of breakdowns or major maintenance that would suggest imminent system failures."

¶ 32. Having determined that the infrastructure element was unsupported, the Commissioner concluded that the balance of the project must fail as well, reasoning that "CVMC supports the rest of the project on the asserted necessity of the infrastructure element." Nevertheless, the Commissioner briefly addressed the other project components, concluding that the "amenity" improvements for ambulatory care failed· to "rise to the level of need," that the hospital had failed to demonstrate "problems from undersized operating rooms," and that modernizing the birthing center for the "convenience and comfort" of expectant mothers and their families did not "rise to the level of need."

II.

¶ 33. What is initially most striking about the Commissioner's ruling is the "disconnect," to borrow CVMC's term, between the record and the decision. The hospital's CON application did not condition the ambulatory care and birthing center elements on the infrastructure improvements, but merely noted the efficiencies to be derived from performing the proposed renovations simultaneously. The application stated plainly that the project had "three principal objectives" — infrastructure upkeep, an integrated ambulatory care center, and a modern birthing center. Each of these components was addressed on its merits at the hearings, as well.[1] The Commis-

---

[1] For example, Daria Mason, the hospital's president and CEO, summarized her testimony as follows: "In conclusion, we are talking about a very nuts and bolts community hospital project. This is not extravagance. This is basically a project that has no new programs, it's meeting basic core mission, it recognizes the transformation of our services to outpatient care, which has already occurred, that transformation. It also will adjust

sioner apparently seized on statements by the hospital's general services officer, who testified that "[t]he main driver, from my perspective being a facilities person, for doing this project was the need for infrastructure upgrade," as well as later testimony by the hospital's president, Daria Mason, characterizing the infrastructure element as "the driving force." Viewed fairly and in context, however, it is clear that the statements went to the economic efficiency of accomplishing the birthing center and ambulatory care components at the same time as the infrastructure upgrades, not to their fundamental need. As Mason explained: "We're tearing down the walls to do that, now is the time to create the efficiency."

¶ 34. Another disconnect is found in the disparity between the record evidence demonstrating a need for infrastructure replacement based on natural systemic obsolescence, and the Commissioner's denial based on the absence of evidence of systemic failure. The Commissioner virtually ignored her own expert's finding that the proposal for "[i]nfrastructure replacement represents equipment nearing its functional lifespan." The problem is compounded by the Commissioner's insistence on appeal that she was not evaluating the proposal against a standard of "absolute necessity" to avoid system failure or life safety violations, despite the explicit statements in her decision to the contrary.

¶ 35. Finally, the decision's analyses of the hospital's birthing center and ambulatory care proposals, while admittedly an afterthought, are shockingly brief and dismissive, characterizing as mere "amenities" and "conveniences" the hospital's well-reasoned arguments for integrated outpatient care and a modern birthing center attuned to patient needs.

_____

the infrastructure that has to be upgraded at this point in time."

¶ 36. Analyzed solely on the record below, this case would test severely the deferential standard traditionally accorded the Commissioner's CON rulings. See *In re Prof'l Nurses Serv., Inc.*, 164 Vt. 529, 532, 671 A.2d 1289, 1291 (1996) (agency decisions are presumed correct absent clear and convincing showing to the contrary). The decision is unresponsive to the weight of the evidence and offers rationalizations for its conclusions rather than persuasive reasons. Absent other considerations, I would hold that the decision is clearly erroneous. The majority has obviously found otherwise based solely on the very forgiving standard of appellate review.

¶ 37. Deference aside, while the matter was pending on appeal before this Court, an event occurred that provided, to me at least, an explanation for the curious dissonance between the record and the ruling in this case. In January 2002, the Governor of Vermont appeared on a radio talk show and was asked directly by the interviewer to explain why the Commissioner had denied CVMC's $12 million project while approving a much larger project for Fletcher Allen Health Center in Burlington.[2] The Gov-

_____

[2] CVMC appended a transcript of the Governor's radio interview to its reply brief. The State, in response, moved unsuccessfully to file a surreply brief, arguing that the interview could not be considered because it was outside the record and raised a new issue for the first time in a reply brief. The State also argued that, contrary to CVMC's claim, the Governor's remarks did not purport to explain the basis of the Commissioner's decision, but merely expressed support for legislation linking CON approval to budget performance. The statements speak for themselves and thus the latter argument fails. As for the propriety of considering the interview in this appeal, our rules provide that this Court may

ernor responded that "[t]he difference is that the Fletcher Allen's [application] was put in before the budget figures and

take judicial notice of facts "not subject to reasonable dispute" and "generally known" within the jurisdiction, "whether requested or not," and "at any stage of the proceeding." V.R.E. 201. Although this Court has not had occasion to consider an issue of this nature, an analogous problem was presented in *In re Pioneer Mill Co.*, 497 P.2d 549 (Haw. 1972), where the state's high court took judicial notice of newspaper articles stating that the trial judge in the case had announced his candidacy for public office prior to his ruling. See *id.* at 551 n.1 (noting that Hawaii's evidence code — similar to our own — authorized judicial notice of "propositions of generalized knowledge which are capable of immediate and accurate demonstration," and that reviewing courts could take judicial notice whether or not the trial court did so). Based on this evidence, the court concluded that the judge had become a candidate for public office at the time of his ruling, and that under the state's constitution he had thereby forfeited his judicial office, requiring reversal of the judgment. *Id.* at 551-52; see also *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (appeals court took judicial notice under Federal Rule of Evidence 201(f) of newspaper article despite fact that article was not before district court); *Mahoney v. Lensink*, 569 A.2d 518, 525 n.20 (Conn. 1990) (state high court took judicial notice of newspaper article containing announcement by state's commissioner of mental health that his department was in the process of drafting a patients' bill of rights); *Tilghman v. Commonwealth*, 366 A.2d 966, 967 (Pa. Commw. Ct. 1976) (court took judicial notice of newspaper articles and news broadcasts that publicized commonwealth's role in urban renewal project).

the Central Vermont [application] came after." As he explained:

> GOVERNOR DEAN: When we saw what the budget figures were again all going far above their exceeded task, we made the decision that we would link CONs with budgets which — which [Commissioner] Betsy [Costle] has the power to do well it's not — it's not as direct as the — as what we're seeking in the Legislature.[3] But we've — we've really had it with these cost increases and we've had it with everybody pointing the finger at everybody else. As I said before, somebody has to take accountability and we made the decision after we saw the budget round in August that we just couldn't go on this way and that we were just going to have to put a stop to the incredible cost escalations and people's insurance premiums and this is something that hasn't been tried before both speaker [F]ree[d] and Secretary and President Pro Temp Peter Shumlin had a press conference last year at this time saying we ought to have a moratorium on CONs until rates go down. That did figure into our thinking.

[3] Earlier in the interview, Governor Dean had expressed his support for legislation introduced by Senator Chard, chair of the Senate Health and Welfare Committee, designed to add criteria to the CON review process linking approval of the CON to the hospital's record of performance within its budget as established by the Commissioner.

RADIO HOST: So Central Vermont had bad timing more than anything else?

GOVERNOR DEAN: Well and also they exceeded their budget targets as they have every year for the last five years by a substantial amount.

RADIO HOST: And Fletcher Allen hasn't?

GOVERNOR DEAN: They have but we had hoped that that wasn't going to happen and they had their CON application in a long time before the budget figures were — were done and they got their CON permission before the budget figures were announced.

¶ 38. The interviewer returned to the subject later in the program, asking whether there was "a double standard here that's happened with these two hospitals?" The Governor replied: "Well, that's what you asked me earlier in the show and I will give you the same answer I gave you earlier which is that this is related to budget performance and the budget performances were available after the Fletcher Allen got their CON."

¶ 39. From the remarks of the Chief Executive, I conclude that the decision to deny CVMC's application was based on nothing in the record or the enumerated statutory criteria. It was based, rather, on a decision to penalize CVMC for what was viewed as a poor record of budgetary performance. CVMC's budget performance during the preceding year, however, is not among the express statutory criteria that its CON application was required to address; it is not among the criteria for which Department staff had sought additional information; and it is most assuredly not among the criteria cited by the

Commissioner in denying CVMC's application.[4]

¶ 40. Such decision-making is plainly improper. The governing statute specifically provides that "[i]n making its determination as to whether a certificate of need shall be issued, the commissioner shall consider *only the criteria* which have been duly adopted and published 90 days prior to the submission of the original application for certificate of need." 18 V.S.A. § 9436(a) (emphasis added). In addition, considerations of due process and fundamental fairness require that an applicant for agency approval be accorded adequate notice of the standards to be applied, and an adequate opportunity to respond to those standards. See *In re Vt. Health Serv. Corp.*, 155 Vt. 457, 461, 586 A.2d 1145, 1147-48 (1990) ("The fairness of the whole procedure must be in accord with due process principles. Crucial to the determination 'is whether or not the parties were given an adequate opportunity to prepare and respond to the issues raised in the proceeding.' ") (quoting *In re Green Mountain Power Corp.*, 131 Vt. 284, 293, 305 A.2d 571, 577 (1973)).

¶ 41. CMVC was not afforded notice of, or an opportunity to respond to, the budget issue that — I believe — apparently determined the fate of its application. A more egregious denial of due process is difficult to imagine. Plainly, such a decision "was in excess of statutory authority," 8 V.S.A. § 16(2), and cannot be allowed to stand.

¶ 42. The only question remaining is that of remedy. A remand for further hearings under these circumstances

---

[4] As Governor Dean noted in his interview, legislation has been introduced to amend the statutory scheme to provide that the Commissioner may consider an applicant's budgetary performance in determining whether to issue a CON. See 2001, S. 286 (Adj. Sess.), § 3.

would be pointless. The administrative process was tainted by considerations extraneous to the issues. The record evidence amply supported approval of the CON application. Therefore, I would reverse the Commissioner's decision, and order that the CON be granted.

